# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| LIBERTY INSURANCE CORPORATION, | ) ) ) |
| Plaintiff, | ) ) Case No.: 1:17-cv-4398 (JPO) |
| v. | ) ) |
| WSP USA, INC., f/k/a PARSONS BRINCKERHOFF, INC., | ) ) ) |
| Defendant. | ) ) ) |

**JOINT STIPULATION OF FACTS FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, the parties jointly stipulate that the following facts are true for summary judgment purposes:

1. Defendant WSP USA Inc. f/k/a Parsons Brinckerhoff, Inc. ("WSP") is a New York corporation with its headquarters at One Penn Plaza in New York City. Answer, ¶¶ 3, 5 at Docket (D. #) 8.

2. According to the underlying Amended Complaint in *Seattle Tunnel Partners v. Shannon & Wilson, Inc., & Parsons Brinckerhoff, Inc.*, WSP "is a licensed Washington Engineer/Land Surveying Corporation with License No. 142". Exhibit A, STP Amended Complaint, ¶ 3.

3. WSP states under "Who We Are" on its website that it is a "professional services firm." WSP states under "Tunnels" on its website that "[b]ringing together all required disciplines under one roof, WSP is a world leader in tunnel planning, design, rehabilitation, and construction."

4. WSP states under "Transportation and Tunnels" on its website that WSP "designed the Alaskan Way Viaduct Replacement in Seattle, the largest diameter tunnel in the world".

5. WSP also states under "Soft Ground Tunneling" on its website that "we pride ourselves on developing innovative strategies to deal with even the most complicated soil situation", and "[i]n Seattle, WSP was heavily involved with the SR-99 Alaskan Way Tunnel project, which was constructed in challenging ground conditions, under more than 150 buildings." WSP states under "Transportation and Tunnels" on its website that it is "experienced designing and managing a variety of construction techniques" in road and highway tunnels.

6. WSP states under "Geotechnical and Ground Engineering" on its website that geotechnical engineering is a "fundamental component" of tunnel projects and WSP's "capability in geotechnical engineering is underpinned by an extensive range of expertise and experience of our complementary team of over 600 geotechnical engineering professionals worldwide."

7. The Notes to WSP's December 31, 2012 Financial Statements state that WSP's "principal operations involve design, engineering, architecture, planning, project management, program management, construction management, design/build, operations and maintenance, and consulting and related services for transportation, highway, tunnel[s]," among other projects.

<u>The Alaskan Way Viaduct Project</u>

8. As alleged in the underlying Amended Complaint attached at Exhibit A, the Washington State Department of Transportation in 2001 "engaged [WSP] to assist in the process of evaluating the repair and/or replacement of the [Alaskan Way] Viaduct, including the preparation of conceptual engineering studies." STP Amended Complaint, ¶¶ 7-8.

9. In 2001, WSP and the State entered into Agreement Y-7888 (Project title: SR 99, Alaskan Way Viaduct Environmental Impact Statement, Phase 2), subsequently referred to by the parties as an "agreement for professional services", for the development of an environmental impact statement with "associated design work for the SR 99, Alaskan Way Viaduct" Project and supplemental tasks.

10. WSP designated and contracted with Shannon & Wilson ("S&W") as its geotechnical subconsultant on the Project. As alleged in the underlying Complaint, WSP "engaged S&W to conduct extensive geotechnical and hydrogeological explorations, tests and studies in the vicinity of the anticipated project corridor". STP Amended Complaint, ¶ 9.

11. Per WSP and S&W's subcontract, S&W was required to obtain prior permission from WSP to "subcontract for the performance of any work". Further, WSP and S&W's subcontract states under "XI. Extra Work" that WSP "may at any time by written order, make changes within the general scope of the agreement in the services to be performed."

12. Per the underlying Amended Complaint, S&W was at relevant times "a licensed Washington Engineer/Land Surveying Corporation with License No. 59." STP Amended Complaint, ¶ 2.

13. In 2002, per the underlying Amended Complaint "S&W (by and through its subcontractor Holt Drilling) drilled and installed several water wells along Alaskan Way . . . including the well that S&W designated 'Test Well # 2' or 'TW-2'." STP Amended Complaint, ¶ 11. Per the Amended Complaint, "S&W installed (or caused to be installed) TW-2 using a 8-inch diameter steel well casing." STP Amended Complaint, ¶ 11.

14. By 2002, WSP with S&W had prepared the initial Geotechnical Baseline Report ("GBR") for the Project incorporating data from a Geotechnical and Environmental Data Report ("GEDR") prepared by S&W.

15. In the November 2002 edition of the GEDR, S&W stated: "We supervised the drilling and installation of . . . one test well and five monitoring wells for the second pumping test" and the "test well for Test No. 2 [was] designated TW-2." The "methods used to drill . . . the pumping well explorations" including TW-2 are summarized in the November 2002 GEDR and in S&W's Pumping Test Results report.

16. S&W's Pumping Test Results report states: "The purpose of pumping tests was to further evaluate groundwater conditions and aquifer parameters in order to refine preliminary dewatering analyses previously completed for the project. Geologic and groundwater conditions for the project were first documented in our Geotechnical and Environmental Data Report dated August 2002."

17. Among the factual allegations in the underlying Amended Complaint, it is alleged that S&W and/or WSP "took no steps to decommission or otherwise remove TW-2 following the 'field explorations' performed in connection with the Project . . . to ensure that STP's TBM would not encounter the 8-inch diameter steel well casing". STP Amended Complaint, ¶¶ 21-22.

18. In December 2005, the Washington State Department of Transportation ("WSDOT") and WSP entered into Agreement Y-9715 (Project title: SR 99, Alaskan Way Viaduct Environmental Impact Statement, Phase 2) "to replace the existing Agreement Y-7888."

19. The Scope of Work exhibit to Agreement Y-9715 states that the "work under this Agreement shall consist of performing [e]ngineering, and other related work as herein defined and necessary to accomplish individual tasks ("Task Orders") issued by the State" and WSP shall

"furnish all services and labor necessary to accomplish these tasks, and provide all materials, supplies, equipment, and incidentals, except as designated elsewhere in this Agreement".

20. Agreement 9715, Section II: Scope of Work states "Each item of work under this Agreement will be provided by Task Order" and "Each Task Order will be considered a separate agreement, identifying the maximum amount authorized, start date and end date, and scope of work specific to the task."

21. Task Order CL, Amendment 02, titled SR 99 Tunnel Preliminary Engineering and Request for Proposals Development, states that WSP "shall develop preliminary engineering for the SR 99 Tunnel Program" and "Preliminary engineering will consist of the following major elements: Civil Design, Structural Design, Architectural Design, Tunnel Systems Mechanical Design, Tunnel Electrical Systems Design, Traffic Surveillance and Control System Design, Geotechnical (support), Tunnel Utility Service Design, Specifications, Construction Planning, Project Visualization, [and] Program-wide preliminary engineering plan set."

22. Within Task Order CL, Amendment 02, Task CL.09 called for Geotechnical Data and Analysis (Support) work that "includes all scope elements related to supporting the state in the development of geotechnical and sub-surface environmental data analysis for the Program and preparation of a Geotechnical Baseline Report for the Project."

23. Within Task Order CL, Amendment 02, Task CL.11 called for Construction Planning work that "includes all scope elements related to construction planning for the tunnel necessary to inform preliminary engineering" for the Project.

24. Under Task Order CL, Amendment 08, the "Bored Tunnel Deliverable" for Task CL.09 was a Draft GBR to be finalized by February 1, 2010. The Technical Lead assigned to the GBR was Timothy Smirnoff of WSP.

25. In 2009 and 2010, Timothy Smirnoff was a senior geotechnical engineer in the Los Angeles office of WSP and a licensed engineer in the State of California.

26. Under Task CL.09: Geotechnical Data and Analysis (Support), the Project allowed a total of 1140 hours of work time for the GBR: 740 hours for a WSP Senior Engineering Manager (Geotech) and 400 hours for a WSP Engineer I.

27. Project documents include certain correspondence on WSP stationery with WSP's then-trademark "PB100" and the words "Over a Century of Engineering Excellence."

28. In May 2010, S&W issued an updated GEDR. In June 2010, WSP with S&W issued an updated GBR which was included with the updated GEDR in the State's Request for Proposal ("RFP") package.

29. According to the Amended Complaint in the underlying action, "WSDOT received two proposals in response to the RFP and ultimately selected STP" ("Seattle Tunnel Partners") for the Project, and in 2011, "WSDOT and STP entered into a Design-Build Contract . . . in which STP agreed to perform certain design, engineering, and construction services in connection with the Project." STP Amended Complaint, ¶¶ 15-16.

30. WSP's June 2010 GBR stated that it "was prepared based upon data collected during the geotechnical exploration program for the SR 99 Bored Tunnel Alternative, portal structure, and appurtenant construction (the Project) which is presented in the GEDR" by S&W.

31. The GBR bore the registered professional engineer stamp of Gordon Clark, Washington engineer License No. 35051:




The Alaskan Way Viaduct & Seawall Replacement Program

Revised SR 99 Bored Tunnel Alternative Design-Build
Project Geotechnical Baseline Report

Agreement No. Y-9715
Task CL.09

The Alaskan Way Viaduct & Seawall Replacement Program is a joint effort between the Federal Highway Administration (FHWA), the Washington State Department of Transportation (WSDOT), and the City of Seattle. To conduct this project, WSDOT contracted with:

Parsons Brinckerhoff
999 Third Avenue, Suite 2200
Seattle, WA 98104

In association with:
Coughlin Porter Lundeen, Inc
Entech Northwest, Inc.
EnviroIssues, Inc.
HDR Engineering, Inc.
Jacobs Engineering Group Inc.
KPFF, Inc.
Magnusson Klemencic Associates, Inc.
Mimi Sheridan, AICP
Parametrix, Inc.
Power Engineers, Inc.
RoseWater GHD
Shannon & Wilson, Inc.
So-Deep, Inc.
Telvent Farradyne, Inc.
William P. Ott Construction Consultants

The Alaskan Way Viaduct & Seawall Replacement Program                June 2010
Revised SR 99 Bored Tunnel Alternative Design-Build Project Geotechnical Baseline Report        i

According to his LinkedIn profile, Gordon Clark was the Manager of Geotechnical and Tunneling Design for WSP.

### The Claims Against WSP in the STP Lawsuit

32. On January 27, 2017, STP filed an Amended Complaint against S&W and WSP. See STP Amended Complaint at Exhibit A (attached).

33. STP's Amended Complaint alleges that:

   a. The State of Washington Department of Transportation (WSDOT) "engaged [WSP] to assist in the process of evaluating the repair and/or replacement of the [Alaskan Way] Viaduct, including the preparation of conceptual engineering studies." STP Amended Complaint, ¶ 8.

7

b. "In connection with its contract with WSDOT, [WSP] engaged S&W to conduct extensive geotechnical and hydrogeological explorations, tests and studies in the vicinity of the anticipated project corridor (i.e., the anticipated location of project features and/or structures)." STP Amended Complaint, ¶ 9.

c. S&W's field explorations included the drilling and installation of boring and observation/test wells including TW-2. STP Amended Complaint, ¶¶ 10-11.

d. Once the decision was made to design and build a new bored tunnel to replace the Viaduct, as alleged in the underlying Amended Complaint, WSP and S&W "prepared the Contract geotechnical reports included in the RFP including the [GBR], which S&W prepared jointly with [WSP] and which failed to identify the 8-inch diameter steel well casing at TW-2, and the [GEDR], which was prepared solely by S&W and which described TW-2 as a 2-inch diameter PVC casing." STP Amended Complaint, ¶¶ 12-14.

e. According to the Amended Complaint, the GEDR described TW-2 as a 2-inch diameter PVC casing in the ground when it was actually an 8-inch diameter steel casing in the ground. STP Amended Complaint, ¶¶ 11, 14.

f. "S&W and/or [WSP] took no steps to decommission or otherwise remove TW-2." STP Amended Complaint, ¶ 22.

g. S&W and WSP "at no point properly disclosed, notified or warned STP that TW-2 was an 8-inch diameter steel well casing, and that the steel well casing was located in the tunnel alignment such that STP's

8

       [Tunnel Boring Machine or "TBM"] would encounter the steel well casing during STP's TBM mining." STP Amended Complaint, ¶ 23.

    h. "STP would have removed (or would have caused to be removed) TW-2 prior to commencement of TBM operation if S&W or [WSP] had made STP aware of the fact that TW-2 was in fact an eight-inch diameter steel well casing." STP Amended Complaint, ¶ 25.

    i. During tunnel mining and excavation in 2013, the project's Tunnel Boring Machine "encountered what was later discovered to be the 8-inch diameter steel well casing known as TW-2." STP Amended Complaint, ¶ 26.

    j. "STP has concluded that hitting TW-2 was a cause in fact of physical damage to the cutting tools of the TBM and a cause in fact of some or all of the other physical damage to the TBM and resulting delays and costs," and alleges that these damages resulted from the conduct of WSP and S&W. STP Amended Complaint, ¶ 33.

    k. "Physical damage to the TBM occurred in whole or part due to . . . S&W and [WSP] fail[ing] to identify the presence of the 8-inch diameter steel well casing at TW-2 in the GBR . . . and/or S&W and [WSP] fail[ing] to remove or otherwise properly decommission (or caused to be removed or properly decommissioned) TW-2 before STP commenced mining with the TBM." STP Amended Complaint, ¶ 33.

34. STP's Amended Complaint states causes of action in Professional Negligence, Negligent Misrepresentation, and Indemnification against WSP. STP Amended Complaint, pp. 10-14.

35. In its Professional Negligence count against WSP, STP alleges that WSP failed to perform its duties as an engineer in accordance with professional standards. STP Amended Complaint, ¶¶ 64-71.

36. Paragraph 72 of the Amended Complaint contains seven sub-paragraphs setting forth specific allegations as to professional negligence by WSP.

37. In subparagraph 72(a), STP alleges that WSP "[i]nstalled (or caused to be installed) TW-2 without adequately memorializing the nature and type of installation" in the GBR and GEDR. STP Amended Complaint, ¶ 72(a).

38. In subparagraph 72(b), STP alleges that WSP "[f]ailed to remove or otherwise properly decommission TW-2 following its abandonment or discontinued use". STP Amended Complaint, ¶ 72(b).

39. In subparagraph 72(c), STP alleges that WSP "[f]ailed to properly indicate the existence and nature of TW-2 in the Contract geotechnical documents". STP Amended Complaint, ¶ 72(c).

40. In subparagraphs 72(d) through (g), STP alleges additional failures in support of its Professional Negligence count against WSP.

41. In its Negligent Misrepresentation count against WSP, STP alleges that WSP did not act with reasonable care or competence in preparing the GBR and that it contained inaccurate and/or incomplete information on which STP relied to its detriment. STP Amended Complaint, ¶¶ 76-78, 80.

42. The Amended Complaint alleges under its Indemnification count against WSP that WSP, "as one of the primary engineering firms involved in the Project, owed a special duty towards Project members, including STP". STP Amended Complaint, ¶ 84(c).

43. The Amended Complaint alleges under its Indemnification count against WSP that WSP, "in providing (or failing to provide) information concerning TW-2 in the GBR, owed a special duty to STP." STP Amended Complaint, ¶ 84(d).

44. The Amended Complaint's Indemnification count against WSP alleges that WSP's special duty arose in part because it owed certain duties when acting "as a licensed engineering firm." STP Amended Complaint, ¶¶ 84(a)-(c).

45. The underlying lawsuit by STP against WSP is ongoing.

<u>The Zurich Professional Liability Insurance Policy</u>

46. Zurich American Insurance Company ("Zurich") issued Architects and Engineers Professional Liability insurance policy No. EOC 587103612 ("the Zurich Professional Liability policy") to WSP and certain related companies for the period November 1, 2014 to November 1, 2015.

47. The Zurich Professional Liability policy covers liability resulting from any error, omission or other act "that causes liability in the performance of Professional Services by you." The Zurich Professional Liability policy defines Professional Services as "those services you are professionally qualified to perform for others including but not limited to the following:

        1. architect or engineer;

        2. landscape architect, land surveyor, or planner;

        3. construction manager;

        4. scientist;

        5. consultant or technical consultants . . . ."

48. On October 27, 2015, WSP gave Zurich written notice of STP's claim against WSP. WSP's written notice of claim stated: "As the project pertains to [WSP]: We did

planning, environmental, and up to around 25% design. It then went Design/Build (Seattle Tunnel Partners – STP)." The notice to Zurich also stated that WSP "performed the preliminary engineering for this [Design/Build] project."

49. Zurich has acknowledged WSP's claim under its Professional Liability Policy for WSP's defense of the STP action.

## The Liberty General Liability Insurance Policy

50. Liberty Insurance Corp. ("Liberty") issued Commercial General Liability insurance policy No. TB7621094060-023 ("the Liberty General Liability policy") to WSP and certain related companies for the period October 1, 2013 to October 1, 2014. Liberty General Liability policy, Exhibit B attached, at WSP00003236.

51. The Liberty General Liability policy was delivered to WSP at its One Penn Plaza headquarters in New York City. Exhibit B at WSP00003233. The Liberty General Liability policy contains an endorsement modifying the policy under New York law, titled "New York Changes – Commercial General Liability Coverage Form." Exhibit B at WSP00003364.

52. The Liberty General Liability policy covers liability in excess of a $250,000 deductible for "damages because of 'bodily injury' or 'property damage' to which this insurance applies" that result from an "occurrence" which is defined as "an accident." The Liberty General Liability policy's coverage is subject to exclusions of coverage. Exhibit B at WSP00003364, WSP00003260-WSP00003265, WSP00003357.

53. The Liberty General Liability policy provides that Liberty has the right and duty to defend WSP against any suit seeking damages "because of 'bodily injury' or 'property damage' to which this insurance applies." The policy also provides that Liberty "will have no

12

duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." Exhibit B at WSP00003364.

54. The Liberty General Liability policy contains a Professional Liability exclusion that states: "This insurance does not apply to 'bodily injury', 'property damage', or 'personal and advertising injury' arising out of the rendering of or failure to render any professional services by you or on your behalf" with respect to "providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor . . . ." Exhibit B at WSP00003357.

55. The Professional Liability exclusion in the Liberty General Liability policy states: "This exclusion applies even if claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the occurrence . . . involved the rendering or failure to render any professional services . . . ." Exhibit B at WSP00003357.

56. The Professional Liability exclusion in the Liberty General Liability policy also states: "Professional services do not include services within construction means, methods techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor." Exhibit B at WSP00003357. "Construction contractor" is not defined in the policy.

57. The text of the Liberty General Liability policy's Professional Liability Endorsement at WSP003357 is reprinted as follows:

COMMERCIAL GENERAL LIABILITY
CG 22 79 04 13

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EXCLUSION – CONTRACTORS – PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2. Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability and Paragraph 2. Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

1. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

    a. Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and

    b. Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.

    This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage", or the offense which caused the "personal and advertising injury", involved the rendering of or failure to render any professional services by you or on your behalf with respect to the operations described above.

2. Subject to Paragraph 3. below, professional services include:

    a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and

    b. Supervisory or inspection activities performed as part of any related architectural or engineering activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

58. Under Liberty's General Liability Policy, Liberty "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply." Exhibit B at WSP00003364.

59. On or about February 4, 2017, WSP gave Liberty notice of STP's claim and provided Liberty a copy of STP's Amended Complaint against WSP (Exhibit A attached). In response, a claims adjuster at Liberty informed WSP by e-mail that it had completed its review

14

of the amended complaint "and determined that the allegations were broad enough to trigger a duty to defend under" Liberty's General Liability Policy. The e-mail also stated: "The primary coverage issue is that our general liability policy specifically excludes coverage for professional services."

60. By letter dated May 19, 2017, Liberty fully reserved all rights under its Professional Liability exclusion and other policy terms while agreeing, subject to reservation of a right of recovery, to contribute to WSP's defense of the STP action pending resolution of the issue of whether the Liberty General Liability policy excludes coverage.

Respectfully submitted,

| ANDERSON KILL P.C. | ROBINS KAPLAN LLP |
|---|---|
| By: /s/ Marshall Gilinsky<br>    Marshall Gilinsky, Esq.<br>    Ethan W. Middlebrooks, Esq.<br>    1251 Avenue of the Americas<br>    New York, New York 10020<br>    Telephone: (212) 278-1000<br>    Facsimile: (212) 278-1733<br>    MGilinsky@andersonkill.com<br>    EMiddlebrooks@andersonkill.com<br><br>*Attorneys for Defendant WSP, Inc., f/k/a Parsons Brinkerhoff, Inc.* | By: /s/ John N. Love<br>    Hollis Salzman<br>    Michael A. Kolcun<br>    399 Park Avenue, Suite 3600<br>    New York, New York 10022-4611<br>    Telephone: (212) 980-7400<br>    HSalzman@RobinsKaplan.com<br>    MKolcun@RobinsKaplan.com<br><br>    John N. Love (*Admitted Pro Hac Vice*)<br>    James S. Harrington (*Admitted Pro Hac Vice*)<br>    800 Boylston Street, Suite 2500<br>    Boston, Massachusetts 02199<br>    Telephone: (617) 267-2300<br>    JLove@RobinsKaplan.com<br>    JHarrington@RobinsKaplan.com<br><br>*Attorneys for Plaintiff Liberty Insurance Corporation* |

Dated: October 25, 2017

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing, Joint Stipulation of Facts For Summary Judgment, was served on Defendant through its counsel of record via ECF on this 25th day of October, 2017.

By:    /s/ John N Love